## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 25-mj-113** |
| **v.** | : | |
| | : | |
| **JUSTIN PAUL ALLRED,** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' MEMORANDUM IN
### SUPPORT OF PRE-TRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that Justin Paul Allred (hereafter, the "Defendant") be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) (crime of violence).

On June 30, 2025, the Defendant was charged by Complaint with Receipt and Distribution of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1).   At the Defendant's initial appearance on July 2, 2025, the United States requested the Defendant's detention pending trial pursuant to the above-referenced provision of the federal bail statute. The Court scheduled the Defendant's detention hearing for July 7, 2025.  Pursuant to U.S.C. § 3143(e)(3)(E), there is a rebuttable presumption in favor of detention.  Because the Defendant poses an unmitigable risk to community safety and cannot overcome the presumption, this Court should order that he remain detained pending trial.

### I.    Factual and Procedural Background

The charges stem from the Defendant's distribution of child sexual abuse material, specifically content depicting the abuse of infants/toddlers, to an undercover officer (hereafter, the "UC") using his Signal account on May 28, 2025.  As further detailed below, after the Defendant

proactively contacted an online account utilized by the UC—an account purportedly operated by the father of a prepubescent boy—the Defendant sent the UC child sexual abuse material and subsequently requested that the UC provide him with content featuring the fictional son.  At the time of his arrest, law enforcement recovered additional child sexual abuse material from the Defendant's residence.

Specifically, on May 22, 2025, from a Washington, D.C. office, the UC was monitoring an online dating application, where the UC maintains a profile identifying himself as a father interested in the sexual exploitation of children. The UC received a message on the dating application from username, "P-3rv," which was subsequently linked to the Defendant, as detailed *infra*.  P-3rv stated to the UC, "Hi stud.  I'm also a NL guy.  Love."  The UC responded, "Hell yah bro.  Wanna chat?"  The user replied, "Yeah.  Are you on ?" and provided the username for his Telegram account's username to divert the conversation to a private messaging application for which content is concealed through technological means.

That same day, the UC contacted the Defendant via the Telegram account provided by the Defendant, advising that the UC was the same user from the online dating application.  In response, the Defendant stated, "Hi there 😈 🏈 "[1]   and indicated the area in which he resided in Washington, D.C.  When the UC asked, "How no limits are you," the Defendant advised, "I don't like hearing babies crying, really brutal rape, scat, blood, and gore.  I know that it's atypical to not

---

[1]  In this context, law enforcement recognizes the football emoji as regularly used by individuals with a sexual interest in children because it references a former high school football player, Matt Estes, who distributed a series of child pornography and depicted himself sexually abusing a toddler child.  The child pornography videos produced by Estes are commonly referred to as "Matt" videos, and the series has developed a cult following among individuals interested in the sexual abuse of prepubescent minor boys. Individuals will use variants of Estes' name, the number "94" (Estes' high school football number), and the football emoji as coded references to child pornography involving prepubescent minor boys.

like crying and screaming. But it just doesn't sit well with me. I usually just turn the sound down when those sound pop up." The Defendant further stated he prefers boys between the ages of "B3-14" and girls between the ages of "g3-9." After the Defendant asked the UC if he was available to voice chat or video call at that time, the UC reported he was unable to but was interested.

On May 24, 2025, the Defendant messaged the UC, "I stroked to cp with my zoom buddies 11 hours this morning, starting a 1 AM. We gotta get you in there." On May 26, 2025, the Defendant messaged the UC and asked, "Hi there mister. Has your family left yet? Do you have many bate[2] buds? What do you watch?" On May 27, 2025, the UC responded to the Defendant, stating, "Hey buddy. I don't have many. I stay pretty discreet because of what I have going on." The Defendant responded, "I hope you grow to trust me and make me one of those regular buds. Would you be interested in meeting up to test the waters?" The UC advised, "I'm very interested in that. Just gotta be comfortable on my end." The Defendant asked, "What will that take from me?" The UC said, "Uhhhhh do you have anything pervy so I know you're legit?" The Defendant reported, "Yeah, but I get nervous sharing on here. Maybe I need to build trust too haha."

Following this exchange, the Defendant once again diverted the conversation to another service provider for which messages are end-to-end encrypted and private by asking the UC if he was on Signal and providing his Signal username. The Defendant stated, "Let's connect there. I feel safer there."

On May 28, 2025, through his Signal account, the Defendant sent the UC material depicting child sexual abuse. Specifically, at approximately 8:59 am, the UC messaged the Defendant via

---

[2] Law enforcement recognizes "Bate," from experience and training, as a common term for masturbation.

the Signal application and provided his usernames from the online dating application and Telegram. The Defendant advised, "Hi bud. Do you like both b and g? Fave ages?" The Defendant reiterated his interest in children again and advised, "I also like some beast." The UC said he was the father of a nine-year-old boy, and the Defendant reported, "I wish I had a son. I would definitely raise him right, starting at baby age so if is normal and natural for him." The Defendant then forwarded a nine-second video to the UC, showing an adult male nude from the waist down with his erect penis exposed. In the video recording, a toddler boy wearing a Kansas City Chiefs shirt is visible between the adult male's leg and is depicted touching the adult male's erect penis as the adult male masturbates. After sending the video, the Defendant stated, "A bit too vanilla for what I owe you, but I think this is hot. I'll send something hardcore soon."

At approximately 9:24 am on May 28, 2025, the Defendant forwarded eight more videos to the UC, all displaying the sexual abuse of infant and toddler boys and girls. One of the videos, which was two minutes and twenty seconds long, was entitled, "BABYFUCKER VIDEO." The video displayed the vaginal and anal penetration of infants and toddlers by the erect penis or hand of adult males. The video also displayed a still, close-up image of an injury to an infant's anus. After sending the videos, the Defendant stated, "I sent younger than I typically go because I can't stand the sound of babies crying, but I assume you'll like them. I've already passed my threshold for comfort, so I hope you'll be satisfied with what I have sent."

The UC then told the Defendant he has sexually abused his purported nine-year-old son since his son was a baby. The UC detailed the abuse to the Defendant and indicated he rarely shared this information but felt comfortable due to the content of the videos the Defendant had sent. The Defendant assured the UC he was trustworthy, advising, "…I have secrets to hide too" before elaborating that his secret was "All the porn I have."

4

The Defendant repeated that he wanted to meet with the UC to masturbate and watch content.  The UC advised he was interested in meeting but asked if the Defendant would share face pictures.  The Defendant forwarded the UC the below picture in Figure A—depicting the Defendant—and expressed an interest in meeting the UC during the evening hours of the next week.



*Figure A: image sent by the Defendant to the UC on May 28, 2025*

On June 25, 2025, the Defendant continued to communicate with the UC via Signal.  The Defendant and the UC discussed meeting at Bluejay.69's residence on July 1, 2025, in Washington, D.C. to watch child sexual abuse material together.  After the UC asked the Defendant where he lived and what time he wanted to meet, the Defendant provided the UC his Northwest D.C. address.

Around 1:37 pm on June 25, the UC asked the Defendant whether he wanted the UC to bring a USB for their scheduled meet, noting that the UC would have his purported nine-year-old son for the weekend immediately before the July 1 meeting, so the UC could "do whatever you

want and bring that too." The Defendant responded, "Fuck yes" and "What kinds of things can I ask for?" Once the UC explained where he drew the line when creating material using his purported son, the Defendant then sent the UC the messages in the grey font within Figure B below.



***Figure B: Screenshot of Signal Messages between the Defendant (grey font) and the UC (blue font) on June 25, 2025***

On July 1, 2025, consistent with their plan, the UC met the Defendant at the address he had provided, where the Defendant was ultimately arrested. At the time of arrest, the Defendant had on his person his password-protected cellphone. Law enforcement also executed a residential

search warrant of the Defendant's residence.  Inside the Defendant's apartment, the Defendant had set up his laptop, which was open and linked to a television equipped with a camera trained towards the bed.  A hard drive containing child sexual abuse material was connected to the laptop, which itself appeared to be synced to the Defendant's cellphone and displayed the Defendant's Signal and Telegram accounts, including the ones used to communicate with the UC.  The Defendant also appeared to be utilizing numerous other messaging applications from his laptop and phone. By his bedside, the Defendant had lubricant, another hard drive, and approximately 1/8 ounce of suspected methamphetamine.

Of note, during an on-scene preview of the Defendant's laptop, law enforcement noticed the Defendant was part of multiple Signal groups, including one they recognized as a tribute to the former football player referenced *supra*; this group is known to disseminate toddler and infant sexual abuse material.  The Defendant appeared to also belong to another Signal group, which law enforcement recognized as focused on prepubescent boys.

## II.     <u>Legal Authority</u>

The Bail Reform Act permits a judicial officer to hold an individual without bond pending trial if the officer finds clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).  Pursuant to 18 U.S.C. § 3142(f)(1)(A), the judicial officer shall hold a hearing on the question of detention upon the motion of the government in a case that involves a crime of violence.

Under 18 U.S.C. § 3142(e)(3)(E), the charged offense carries a rebuttable presumption that the Defendant presents a danger to the community and that no pretrial release condition or combination of conditions may be imposed to assure the safety of any other person and the

community.  This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released").

    In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

    Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the section 3142(g) factors. *See United States v. Ali*, 793 F. Supp. 2d 386, 388 (D.D.C. 2011). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

### III.    Analysis

    Due to the charged offense, the Defendant is presumptively dangerous under Section 3142(e)(3)(E) of the Bail Reform Act.  The United States respectfully submits the Defendant cannot rebut the presumption in favor of detention, and there are no conditions of release adequate

to reasonably assure community safety. Therefore, this Court should detain the Defendant pending trial.

### A.    Nature and Circumstances of the Offense Charged

First, the nature and circumstances of the offense strongly weigh in favor of detention. The Defendant's conduct significantly harms our community by propagating and fueling demand for videos depicting the rape and sexual abuse of our community's most vulnerable members, very young children. "Child pornography depicts pictorial evidence of physical sex abuse against and exploitation of children and the production and distribution of such contraband carries a multitude of harms." *United States v. Galarza*, No. 18-MJ-146 (RMM), 2019 WL 2028710, at *6 (D.D.C. May 8, 2019) (Howell, C.J.) (reversing release order); *United States v. Nickelson*, No. 18-MJ-102 (GMH), 2018 WL 4964506 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same); *United States v. Blanchard*, No. 18-MJ-101 (GMH), 2018 WL 4964505, at *4 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same). That harm is illustrated where, as here, the Defendant requested the creation of such material from the UC, as further discussed below.

Children captured in images and videos depicting their sexual abuse are significantly harmed when the images and videos are created, and their re-victimization occurs whenever an individual, such as the Defendant, views and shares these images for his own and others' sexual gratification. *See Galarza*, 2019 WL 2028710, at *6 (noting that "'the perpetual nature of child pornography distribution on the Internet causes significant additional harm to victims,' [who] 'live with persistent concern over who has seen images of their sexual abuse' and how those images are being used to cause additional harm.'" (quoting U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES (Dec. 2012) at vii); *Nickelson*, 2018 WL 4964506, at *4 (same); *Blanchard*, 2018 WL 4964505, at *4 (same).

Indeed, the gravity of the offense is reflected in Congress's assessment that individuals charged with distributing child pornography should be presumed detained pending trial, *see* 18 U.S.C. § 3142(e)(3)(E), and upon conviction, are subject to a five-year mandatory minimum term of imprisonment and the statutory maximum sentence of up to 20 years' incarceration, *see id.* § 2252(b)(1).  What's more, the Signal messages the Defendant exchanged with the UC on June 25, 2025—including those depicted in Figure B—could subject the Defendant to even steeper penalties for attempting production of child pornography, in violation of 18 U.S.C. § 2251, which carries a mandatory minimum of 15 years' incarceration and a maximum sentence of up to 30 years' incarceration.

**B.     The Weight of the Evidence Against Defendant**

The overwhelming evidence against the Defendant similarly weighs in favor of detention. Where, as here, "the government possesses overwhelming evidence that the defendant is guilty of the crime charged—and the nature of the charged offense involves a danger to the community— then the second factor will help meet the government's burden of persuasion." *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018).  As described above, the UC observed and memorialized the Defendant's Telegram and Signal messages, including the Defendant's Signal messages sending multiple child pornography videos and encouraging the UC to sexually abuse the UC's purported young son for the Defendant's viewing pleasure.

The Signal account communicating with the UC about child sexual abuse material is plainly linked to the Defendant.  At the time of his arrest, law enforcement previewing the Defendant's laptop from his apartment noted his Signal account is the one used to communicate with the UC and the conversation with the UC was "pinned" to display at the top of the Defendant's

chats on the Signal messaging app. Further, on May 28, 2025, the Defendant sent the UC his image, which corresponds with the Defendant's D.C. driver's license photo shown below.



*Figure C: image sent by the Defendant to the UC on May 28, 2025 (L);*
*ALLRED's D.C. Driver's License Photo (R)*

And on June 25, 2025, using that same Signal account, the Defendant provided the very address in Northwest D.C. where the Defendant was ultimately arrested on July 1, 2025, and where the Defendant reported residing, *see* Pretrial Services Report [ECF No. 6] at 1.[3]

**C.    The Defendant's History and Characteristics**

The United States respectfully submits that the third factor concerning the Defendant's history and characteristics also weighs in favor of detention. Although the Defendant is 44 years old, has minimal criminal history, and a steady history of employment, he also appears to have a longstanding interest in child pornography and its production and distribution. Concerningly, once the UC divulged that he used his purported nine-year-old son to create sexual abuse material, the Defendant alluded to having his own secrets pertaining to "[a]ll the porn I have." This is supported

---

[3] What's more, prior to his arrest, on June 25, 2025, law enforcement searched a commercial database listing the Defendant among the residents at the address he had provided the UC, where law enforcement ultimately arrested the Defendant.

by the recovery of additional child sexual abuse materials—the extent of which remains under law enforcement review—from the Defendant's residence at the time of his arrest.  He further expressed his wish to have a son of his own, implying that, much like the UC, the Defendant would groom his son at infancy "so if is normal and natural for him" to be sexually abused and depicted in child pornography.  Moreover, his willingness to request that the UC engage in specific hands-on abuse of his fictional son, and to document said abuse, is incredibly concerning.  It is also clear from his communications with the UC, including his requests to use Telegram and Signal, as well as the fact he has a Master's degree, that he does not lack sophistication; indeed, it appears he is well-versed in the illicit methods typically used to conceal identity and evade law enforcement detection.

Put simply, it is reasonable to infer from the sum of the Defendant's conduct and statements, combined with his membership in multiple Signal groups for like-minded individuals, that the Defendant's offense conduct was neither aberrational nor a momentary lapse in judgment. Rather, it appears to part of a pattern of conduct the Defendant has consistently engaged in. Moreover, it appears that the Defendant is more than willing to solicit and incentivize others to engage in hands-on abuse to satisfy himself.  Thus, his lack of significant criminal history and any other mitigating circumstances are eclipsed, or at the very least offset, by the Defendant's criminal conduct and his other characteristics.

### D.    <u>Danger to the Community</u>

The nature and seriousness of the danger to any person or the community posed by the Defendant's release points squarely towards detention.  That the Defendant poses a danger to the community is presumed by statute, *see* 18 U.S.C. § 3142(e)(3)(E), and should be factored into the Court's analysis, even if contrary evidence is presented.  *See Ali*, 793 F. Supp. 2d at 388.  And as

discussed above, the dangers concomitant with the Defendant's conduct cannot be understated—the distribution of child pornography results in severe mental, emotional, and physical trauma to the children victimized by offenders, such as the Defendant, who seek sexual gratification through viewing and sharing of images depicting the sexual abuse of children. It is precisely "[t]hese significant harms and dangers [that] animated the Congress to create the statutory presumption of detention in these cases." *Galarza*, 2019 WL 2028710, at *7

Release conditions cannot sufficiently mitigate this danger and prevent the Defendant from covertly reengaging in the offense conduct. Given "the uniquity of internet-capable devices[,]" the challenges in fashioning release conditions to mitigate the danger the Defendant's release presents are "insurmountable[.]" *See United States v. Dhavale*, 2020 WL 1935544, at *5 (D.D.C. Apr. 21, 2020). This is particularly true in a case such as this, where it is clear the Defendant used multiple online accounts across multiple applications to engage in his conduct and where he appears to have significant connections to other like-minded individuals. Similarly, the United States is skeptical that a third-party custodian can adequately monitor and enforce release conditions for 24 hours every day to prevent the Defendant from any internet access. Such challenges are only exacerbated by the Defendant's apparent technological sophistication, evinced, for example, by him rerouting incriminating conversations with the UC to multiple secure messaging platforms for which content is not easily detected by law enforcement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

13

IV.    <u>**Conclusion**</u>

For the foregoing reasons, the United States respectfully requests that the Court issue an

Order granting its Motion that the Defendant be held without bond pending trial.

Respectfully submitted,
JEANINE FERRIS PIRRO
Interim United States Attorney


By: <u>*/s/ Sitara Witanachchi*</u>
SITARA WITANACHCHI
D.C. Bar Number 1023007
ANDREA DUVALL
AR Bar Number 2013114
Assistant U.S. Attorneys
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
Telephone: (202) 252-2400
Sitara.witanachchi@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I caused a copy of the foregoing to be served upon counsel of record via the Electronic Case Filing (ECF) system on July 6, 2025.

By:     <u>*/s/ Sitara Witanachchi*          </u>
          Sitara Witanachchi
          Assistant United States Attorney

15